IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 2, 2018

## IN RE R.S. ET AL.

**Appeal from the Circuit Court for Hamblen County**
**No. 16CV227, 16CV235    Thomas J. Wright, Judge**

_____

### No. E2018-00270-COA-R3-PT

_____

This is a termination of parental rights case. Appellant/Father appeals the trial court's termination of his parental rights to the two minor children on the grounds of: (1) abandonment by an incarcerated parent by wanton disregard, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv); (2) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (3) substantial noncompliance with the reasonable requirements of the permanency plan, Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2). Appellant also appeals the trial court's finding that termination of his parental rights is in the children's best interests. Because there is clear and convincing evidence to support both the grounds for termination of Appellant's parental rights and the trial court's finding that termination is in the children's best interest, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and W. NEAL MCBRAYER, J., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Robert E.

Herbert H. Slatery, III, Attorney General and Reporter, and W. Derek Green, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I. Background**

Robert E. ("Appellant," or "Father") is the biological father of the minor children, R.Y.E. (d/o/b May 2009) and B.J.E. (d/o/b/ October 2013) (together with R.Y.E., the "Children").[1] The Tennessee Department of Children's Services ("DCS," or "Appellee") became involved with this family in 2015. On or about May 3, 2015, the children's mother reported to police that Father had bound her with tape and forcibly raped her while the Children were in the home. R.S. (d/o/b October 2006), the Children's half-brother by a different father, was also present in the home.[2] Mother further reported that, on a separate occasion, Father had choked her while the Children were present. Father was charged with kidnapping, aggravated rape, and domestic assault. While these charges were pending, mother was granted an order of protection against Father. She reported that, after she left the home, Father threatened to kill himself, her, and the Children. R.S. told Child Protective Services Investigators that Father had poured gasoline into a soda bottle, stating that he intended to set fire to the home where mother was staying. R.S. also reported that he heard Father say that Father would "burn down the mother's home with the children inside, and that . . . he was going to kill himself before he goes to prison." On several occasions, Father also asked R.S. to deliver notes to mother, in violation of the no contact order.

On June 24, 2015, the Children were removed from the home due to mother's drug use, reports of domestic violence, Father's threats of murder and suicide, and his violation of the no contact order. Mother moved out of the home with Father, but she was subsequently evicted from her new home. At the hearing on the petition to terminate parental rights, mother testified that, after her eviction, she dropped the order of protection and moved back into Father's home. She explained that she relied on him for transportation to visits with the Children, and she thought that working with Father offered the best chance of reunification with the Children.

In July 2015, Father participated in the development of a permanency plan. The plan required that he: (1) abide by the no contact order; (2) resolve his legal issues and refrain from obtaining any new charges; (3) provide proof of transportation; (4) demonstrate appropriate caregiving during interactions with the Children; (5) obtain and maintain a safe and stable home; (6) develop an appropriate daycare plan for the Children; (7) obtain and maintain a legal source of income and provide DCS proof of same; (8) have appropriate furniture, supplies, and food in the home and allow DCS, the guardian ad litem, and providers access to the home; (9) complete a mental health

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names so as to protect their identities.

[2] Neither mother nor R.S. are involved in the instant appeal.

assessment, follow all recommendations, and provide proof of compliance; (10) attend all of the Children's medical appointment; (11) bring appropriate food, diapers, and toys to all visits; (12) complete parenting classes, follow all recommendations, and provide proof of compliance; (13) demonstrate an ability to provide for the Children by asking what they need at least once a month and providing gifts at holidays and birthdays.

In January 2016, the permanency plan was revised to add the requirements that Father: (1) attend and actively participate in domestic violence classes for offenders, follow all recommendations, and provide proof of compliance; and (2) pay child support. At the family and team meeting where the parenting plan was revised, Father "stated that he was not going to work on any action steps of the plan until his criminal matters have been heard."

In February 2015, the juvenile court adjudicated the Children to be dependent and neglected as to Father due to his "statements of his intent to commit violence against the children as well as his statements that he will kill himself which he made in front of the children."[3] The juvenile court concluded that removal was in the Children's best interest due to the "emotional . . . and psychological abuse" perpetrated by Father. The court also found that Father was not in compliance with the permanency plan at that time.

The permanency plan was revised in July 2016 with no new requirements. At that time, Father was attending scheduled visits with the Children. Although he reported that he had employment, transportation, and housing, he did not provide proof to DCS as required under the permanency plan. Again, he reiterated that he "was not going to work on any action steps of the plan until his criminal matters have been heard." In July 2016, the juvenile court again found that Father was not in substantial compliance with the permanency plan and "reminded [] Father that by refusing to complete any steps on the permanency plans, he runs the risk of having his parental rights terminated." The court further admonished Father to review his copy of the Criteria for Termination of Parental Rights.

On November 23, 2016, Father pled guilty to aggravated assault and was sentenced to three years,[4] consisting of 106 days of incarceration followed by supervised probation. He was incarcerated on the same day of his guilty plea.

On December 8, 2016, DCS filed a petition to terminate mother and Father's parental rights in the Circuit Court for Hamblen County (the "trial court"). As grounds

---

[3] The juvenile court adjudicated the Children dependent and neglected as to mother in a separate hearing so as to keep the parents apart and in compliance with the no contact order.

[4] Upon mother's recommendation, Father's charges were amended to aggravated assault from kidnapping, aggravated rape, and domestic assault. However, at the hearing on termination of parental rights, mother affirmed that her statements to police about being bound and forcibly raped were true.

against Father, DCS averred: (1) abandonment by an incarcerated parent by wanton disregard, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv); (2) abandonment by failure to provide a suitable home, Tenn. Code Ann. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii); (3) substantial noncompliance with the reasonable requirements of the permanency plan, Tenn. Code Ann. §§ 36-1-113(g)(2) and 37-2-403(a)(2); (4) persistence of the conditions that led to the Children's removal from the parent's home, Tenn. Code Ann. § 36-1-113(g)(3); and (5) severe child abuse, Tenn. Code Ann. §§ 36-1-113(g)(4) and 37-1-102(b)(21). In its petition, DCS averred that, prior to his incarceration, Father had only complied with the permanency plan by visiting the Children and providing some support. DCS stated that it had offered Father help with permanency plan compliance, and had requested funding for parenting classes, domestic violence classes, and mental health assessment. Despite its repeated offers to help Father work on the permanency plan requirements, DCS stated that Father had refused assistance and had intentionally avoiding working on the permanency plan requirements pending resolution of his criminal charges.

Father was released from incarceration on January 25, 2017. By order of January 26, 2017, the trial court appointed a guardian ad litem to represent the Children. By order of February 2017, the trial court appointed an attorney to represent Father.

While the petition to terminate his parental rights was pending in the trial court, in May 2017, the juvenile court found, for the first time, that Father was "working toward compliance" with the permanency plan. Specifically, the juvenile court found that, after his release from prison, Father had completed parenting and domestic violence classes. However, while Father reported that he had obtained stable housing and income, and had completed a mental health assessment, the juvenile court noted that Father had provided no proof of same. DCS caseworker, April Turner, testified that she had followed up with the providers Father claimed to have worked with in obtaining the mental health assessment, but the providers were unable to provide documentation (either because none existed or because Father had failed to complete the required authorization forms). Ms. Turner last spoke with Father in May of 2017. She testified that, despite numerous attempts to contact Father throughout the summer and fall of 2017, to inform him of meetings and to ask for documentation, she was unable to reach him for the remainder of the case.

On November 30, December 4, and December 5, 2017, the trial court heard the petition to terminate Father's parental rights. By order of January 25, 2018, the trial court terminated Father's parental rights on the grounds of: (1) abandonment by an incarcerated parent by wanton disregard; (2) abandonment by failure to provide a suitable home; and (3) substantial noncompliance with the reasonable requirements of the permanency plan. The trial court also found, by clear and convincing evidence, that termination of Father's parental rights was in the Children's best interest. Father appeals.

## II. Issues

There are two dispositive issues, which we state as follows:

1. Whether there is clear and convincing evidence to support at least one of the grounds for termination of Appellant's parental rights.

2. If so, whether there is clear and convincing evidence to support the trial court's determination that termination of Appellant's parental rights is in the Children's best interests.

## III. Standard of Review

Under both the United States and Tennessee Constitutions, a parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (Tenn. 1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174 (Tenn. 1996). Thus, the state may interfere with parental rights only when a compelling interest exists. *Nash-Putnam*, 921 S.W.2d at 174-75 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). Our termination statutes identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B*., Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. §§ 36-1-113(c); *In re D.L.B*., 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 769. Accordingly, both the grounds for termination and that termination of parental rights is in the child's best interest must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c)(1); *In re Valentine*, 79 S.W.3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re M.J.B*., 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). Such evidence "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id*. at 653.

In view of the heightened standard of proof in termination of parental rights cases, a reviewing court must modify the customary standard of review in Tennessee Rule of Appellate Procedure 13(d). As to the trial court's findings of fact, our review is de novo

with a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).  We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights.  *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

In its order terminating Appellant's parental rights, the trial court specifically found that both mother and Ms. Turner, were credible witnesses.  When the resolution of an issue in a case depends on the truthfulness of witnesses, the trial judge, who had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues.  *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995). The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court.  *See Whitaker*, 957 S.W.2d at 837; *McCaleb*, 910 S.W.2d at 415; *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997).

### IV. Grounds for Termination of Parental Rights

As noted earlier, the trial court relied on the following statutory grounds in terminating Appellant's parental rights: (1) abandonment by an incarcerated parent by wanton disregard; (2) abandonment by failure to provide a suitable home; and (3) substantial noncompliance with the reasonable requirements of the permanency plan. Although only one ground must be proven by clear and convincing evidence in order to terminate a parent's rights, the Tennessee Supreme Court has instructed this Court to review every ground relied upon by the trial court to terminate parental rights in order to prevent "unnecessary remands of cases." *In re Angela E.*, 303 S.W.3d 240, 251 n.14 (Tenn. 2010).  Accordingly, we will review all of the foregoing grounds.

### A.  Abandonment by Wanton Disregard

The trial court found that Father abandoned the Children by wanton disregard.  As defined at Tennessee Code Annotated Section 36-1-102(1)(A)(iv), abandonment, as a ground for termination of a parent's rights, may be established if "the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child."  Tenn. Code Ann. § 36-1-102(1)(A)(iv).  Although the statute does not define "wanton disregard," this Court has explained that

> [i]ncarceration alone is not conclusive evidence of wanton conduct prior to incarceration.  *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005).  Rather, "incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a

broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id*. The statutory language governing abandonment due to a parent's wanton disregard for the welfare of a child "reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and recognizes that a "parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id*.

*In re C.A.H*., No. M2009-00769-COA-R3-PT, 2009 WL 5064953, at *5 (Tenn. Ct. App. Dec. 22, 2009). We further note that the ground of abandonment by wanton disregard does not require that the conduct at issue occur within the four months prior to incarceration. *In re Audrey S.*, 182 S.W.3d at 865 ("This test has no analog to the first statutory definition of abandonment [i.e., abandonment by willful failure to visit or support], and it is not expressly limited to any particular four-month period."). Rather, Tennessee courts may consider the parent's behavior throughout the child's life, even when the child is in utero. *See In re A.B.*, No. E2016-00504-COA-R3-PT, 2017 WL 111291, at *10 (Tenn. Ct. App. Jan. 11, 2017). In short, "[t]he actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

In its order terminating Father's parental rights, the trial court found, in relevant part, that:

The Court finds that [Father] engaged in conduct that exhibits a wanton disregard for the children's welfare by violently sexually assaulting the children's mother in the family home while the children were present therein and by making threats to kill the Mother, the children, and himself within the children's hearing. The court credits Mother's testimony regarding her sexual assault by [Father] . . . .

In addition to finding that the above detailed behaviors by [Father] exhibited a willful and wanton disregard for the welfare of the children, the court finds that [Father] failed to engage in the case or begin the services requested by DCS until he was able to resolve his pending rape and kidnapping charges also exhibited a willful and wanton disregard for the children. The court opines that this behavior shows [Father] was focused on himself rather than exhibiting any care and concern for his own children. This selfishness, in combination with his other violent and emotionally unstable behavior, demonstrates a willful and wanton disregard for the children.

Turning to the record, there is ample evidence concerning Father's rape of mother while the Children were present in the home. Without elaborating on the particulars of Father's actions, suffice it to say that the criminal acts, which Father perpetrated against mother, are horrific. Mother's testimony, which the trial court found credible, corroborates the police report and the investigating officer's testimony. While Father's rape of mother would be sufficient to conclude that he exhibited a wanton disregard for the welfare of the Children prior to his incarceration, the record reveals that Father also perpetrated physical abuse against mother by choking her and threatening her with baseball bats and other weapons. In addition, Father threatened mother and the Children with physical harm. The Children were aware of Father's behaviors, and R.S. and R.Y.E. both made repeated, separate, and consistent disclosure to their therapists regarding Father's domestic violence and abuse.

R.S., who is the oldest child, is not the subject of this appeal; however, the ample evidence concerning the devastating consequences of R.S.'s exposure to Father's behaviors indicates a dire need to keep the younger Children (who are subject to this appeal) from further exposure to Father's sexually deviant and violent behaviors. As noted by the trial court, Father's failure to engage in the requirements of the permanency plan, which (in part) were directed toward his violence, further substantiates his wanton disregard for these Children. From the record, there is clear and convincing evidence to support this ground for termination of Father's parental rights.

## B. Abandonment by Failure to Provide a Suitable Home

The trial court found that Father abandoned the Children by willfully failing to establish a suitable home. Relevant to this argument, Tennessee Code Annotated Section 36-1-102(1)(A)(ii) indicates that abandonment may be found when:

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a

lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;....

A suitable home "requires more than a proper physical living location." *In re Hannah H*., No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014) (quoting *State v. C.W*., No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). "It requires that the home be free of drugs and domestic violence." *Id*.

In its order terminating Father's parental rights, the trial court found that "[i]n the four months following removal, DCS made reasonable efforts to assist [Father] in providing the children with a suitable home by offering to schedule and pay for services required of him . . . and contracting with Youth Villages Pilot II Program to provide additional resources and service to [Father], among other actions." Despite DCS's efforts, the trial court further found that Father "made no efforts within the first four months to provide a suitable home for the children and still had not made any at the time the termination of parental rights petition was filed seventeen months later." As stated above, Section 36-1-102(1)(A) requires that when a termination petition is based on the ground of abandonment by failure to provide a suitable home, DCS must "for a period of four (4) months following the removal," make reasonable efforts to assist the parents with establishing a suitable home for the children. Here, the Children were removed from parents' home on June 24, 2015. The relevant time period for considering this ground's application against Mother and Father is June 25, 2015, through October 24, 2015. We agree with the trial court's finding that DCS made reasonable efforts to assist Father in establishing a suitable home for the Children during the relevant time period; however, by his own admission, Father failed to avail himself of the resources offered to him, stating that he would not participate in the permanency plan requirements until his criminal charges were resolved.

At the time of the hearing on the petition to terminate his parental rights, Father had not shown that he had a proper home or any means of care and support for the Children. Not only was there a lack of evidence concerning Father's living situation, but more troubling was the lack of evidence that Father had addressed the abusive behaviors that precipitated the Children's removal to state custody. As such, there is no evidence to suggest that Father's violent behavior will not continue. Despite DCS's efforts to assist Father toward addressing these concerns, he made no efforts to assist himself. As such, it does not appear that Father can provide these Children with a safe home, free of domestic violence, and sexually deviant behavior. From the record, we conclude that there is clear

and convincing evidence to support the trial court's termination of Father's parental rights on this ground.

## C. Failure to Substantially Comply with the Requirements of the Permanency Plan

We next consider the trial court's finding that Father failed to substantially comply with the requirements of the permanency plan. Tennessee Code Annotated Section 36-1-113(g)(4) provides that a ground for termination exists where "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]" Further, Tennessee Code Annotated Section 37-2-403 provides, in relevant part:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

The determination of whether there has been substantial noncompliance with a permanency plan is a question of law, to be reviewed on appeal de novo with no presumption of correctness. *In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Termination of parental rights under Tennessee Code Annotated Section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under Section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656-57 (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 657 (citing *In re Valentine*, 79 S.W.3d at 548-49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

In its order terminating Father's parental rights, the trial court made the following, relevant findings concerning noncompliance with the permanency plan:

> At trial, it was uncontroverted that [Father] was aware of his responsibilities on the permanency plans and that he either participated in the development of the permanency plans in question or that his requirements had been discussed with him following the creation of the

plan. It was also uncontroverted that DCS and the Guardian ad litem stressed to him the importance of beginning his steps as soon as possible to be able to regain custody of the children . . . . By his own admission, [Father] understood what was required of him on his permanency plan and did nothing to begin working those steps until after he was released from jail in February, 2017, despite repeated offers by DCS to assist him with the steps and to pay for them. While [Father] testified that he had completed his mental health assessment, has provided copies of his pay stubs to the DCS secretary, and has provided documentation about his housing, the court does not credit this testimony and, therefore, finds that [Father] did not complete any steps on the permanency plans. The court further finds that the responsibilities included in the permanency plans introduced by DCS were reasonably related to the reasons for foster care and that DCS made reasonable efforts to assist [Father] in completing the steps required of him. Despite this, [Father] made no effort to complete his steps until after the petition to terminate his parental rights was filed by DCS and he is in substantial noncompliance with the permanency plan.

Here, the trial court found that the requirements of the permanency plan were reasonably related to remedying the conditions requiring foster care. From the record, we agree. Despite numerous efforts on the part of DCS, at the time of the hearing, Father had yet to fully complete any of the requirements. While Father visited the Children and provided support, what he did not do was to work on his behaviors so as to provide a home free of violence. The requirement that he address the psychological and emotional abuse issues was of paramount importance, and Father did nothing toward this goal. In fact, as noted above, Father intentionally refused to work toward satisfaction of his permanency plan requirements until he was released from prison. That was some eighteen months after the Children were removed from his custody. Furthermore, according to Ms. Turner, in the last six months before the hearing, Father completely stopped responding to her calls and text. From the totality of the circumstances, there is clear and convincing evidence to support the trial court's termination of Father's parental rights on the ground of failure to substantially comply with the reasonable requirements of the permanency plan.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004). When a parent has been found to be unfit (upon establishment of ground(s) for termination of parental rights), the interests of parent and child diverge. *In re Audrey S.*, 182 S.W.3d at 877. The focus shifts to the child's best interest. *Id.* at 877. Because not all parental conduct is irredeemable, Tennessee's termination of parental

- 11 -

rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest. *Id*. However, when the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child. Tenn. Code Ann. § 36-1-101(d). Further, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194.

The Tennessee Legislature has codified certain factors that courts should consider in ascertaining the best interest of the child in a termination of parental rights case. As is relevant to the instant case, these factors include, but are not limited to, the following:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2)Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> ***
>
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines . . . ;

Tenn. Code Ann. § 36-1-113(i). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R*., 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Depending on the circumstances of an individual case, the consideration of a single factor

or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S.*, 182 S.W.3d at 877. As explained by this Court:

> Ascertaining a child's best interests does not call for a rote examination of each of Tenn. Code Ann. §§ 36-1-113(i)'s nine factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White*, 171 S.W.3d at 194.

In its order terminating Appellant's parental rights, the trial court made the following findings concerning the Children's best interests:

> The court finds that the facts and circumstances in this case warrant a finding that it is in the best interests of the children for the termination to be granted by clear and convincing evidence. First, the court considered the factors outlined in T.C.A. § 36-1-113(i) and found that factors one, two, four, five, and six favored a finding that it was in the children's best interest to terminate the parental rights of [Father]. The Court found that factors three and nine supported maintaining the parental rights of [Father]. The Court also determined that, as to [R.Y.E.], the child is so emotionally or mentally damaged that there is no question years of intensive psychotherapy and family therapy would be necessary before the child could ever overcome what occurred between him and [Father] and that, as a result, requiring the child to work towards reunification with [Father] would not be in his best interest. As to the child, [B.J.E.], the Court found that [Father's] brutal sexual assault of the mother and his focus on saving his own skin rather than on how to regain custody of his children supported a finding by clear and convincing evidence that it is in the child's best interest that [Father's] parental rights be terminated.

As discussed in detail above, despite DCS's efforts, Father has failed to address the underlying psychological issues that cause his violent actions. In this regard, he has clearly failed to make "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [Children's] best interest[s] to be in [his] home." In addition, there is no evidence to suggest that the Children have a meaningful relationship with Father. In fact, the evidence suggests that Father's presence at visits causes the Children emotional upset. More troubling is the lasting effect of living with Father on the oldest child, R.S. R.S. described his Father as "a bad man that did terrible things." From the record, we agree. While we concede that people can change, here there is no evidence of

such transformation in Father. As the trial court found, it will take years for R.S. to "overcome what occurred between him and [Father];" we can only hope that the younger Children's more limited exposure to Father will allow them to adjust more quickly. In fact, the record indicates that the Children are doing well in foster care, that they have bonded with their foster parents, and are enjoying stability and love for perhaps the first time in their young lives. It is clear that a change in caregivers would be detrimental to the Children. From the totality of the circumstance, there is clear and convincing proof to support the trial court's determination that termination of Father's parental rights is in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's order terminating Appellant's parental rights to R.Y.E. and B.J.E. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed to the Appellant, Robert E. Because Robert E. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE